IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Jamieka Renee Holmes, | ) | C/A No.: 1:13-3430-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On April 12, 2011, Plaintiff filed an application for SSI in which she alleged her disability began on January 1, 2000. Tr. at 123–29. Her application was denied initially

and upon reconsideration. Tr. at 72–73, 76. On August 7, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Thomas G. Henderson. Tr. at 26–38 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 17, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–25. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 9, 2013. [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 30 years old at the time of the hearing. Tr. at 19. She completed high school. Tr. at 19. Her past relevant work ("PRW") was as a graphic designer and a janitorial worker. Tr. at 36. She alleges she has been unable to work since January 1, 2000. Tr. at 123. However, because Plaintiff's claim is for SSI, her established onset date is April 12, 2011.[1]

2.    Medical History

Plaintiff was examined by Aljoeson Walker, M.D., at MUSC's Neuro-Opthalmology Clinic on December 10, 2003. Tr. at 241. She reported blurry vision and recent weight gain. *Id.* Her vision was noted to be 20/100 on the left and 20/50 on the

---

[1] According to the Social Security Administrations, Program Operations Manual Systems ("POMS"), because retroactive benefits cannot be paid in SSI claims, the earliest possible established onset date in an SSI claim is the application filing date or protective filing date. POMS DI 25501.370(A)(1).

right and she had optic nerve swelling. *Id.* Dr. Walker stated he suspected pseudotumor cerebri[2] and referred Plaintiff for a spinal tap to confirm the diagnosis. *Id.*

Plaintiff followed up with Dr. Walker on April 14, 2004. Tr. at 249. Pseudotumor cerebri was confirmed. *Id.* She reported no change in vision, but recent episodes of decreased hearing. *Id.*

On November 12, 2004, Plaintiff reported to Dr. Walker that she was not taking medications for pseudotumor cerebri because she was unable to afford them. Tr. at 253. Plaintiff reported she was experiencing daily headaches. *Id.* Her blood pressure was elevated at 151/92 and she weighed 332.6 pounds. *Id.* Dr. Walker diagnosed papilledema.[3]

On October 20, 2005, Gregory W. Niemer, M.D., wrote a letter in which he indicated he treated Plaintiff for fibromyalgia and pseudotumor cerebri. Tr. at 227. Dr. Niemer indicated that Plaintiff's fibromyalgia caused severe daily fatigue and myalgias

---

[2] According to the National Institutes of Neurological Disorder and Stroke, "[p]seudotumor cerebri literally means 'false brain tumor.'" It is a condition caused by a buildup of cerebrospinal fluid that causes increased intracranial pressure and its symptoms, which include headache, nausea, vomiting, and pulsating sounds within the head, are similar to those of large brain tumors. National Institutes of Neurological Disorders and Stroke [Internet]. Bethesda (MD): National Institutes of Health. NINDS Pseudotumor Cerebri Information Page; [updated 1 Nov. 2010; accessed 6 Nov. 2014]. Available from: http://www.ninds.nih.gov/disorders/pseudotumorcerebri/pseudotumor cerebri.htm. A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (court may "properly take judicial notice of matters of public record").

[3] Papilledema is swelling of the optic nerve in the back of the eye. It is a common symptom of pseudotumor cerebri. A.D.A.M. Medical Encyclopedia [Internet]. Los Angeles (CA): A.D.A.M., Inc.; ©1997–2014. Pseudotumor cerebri; [updated 27 Feb. 2013; accessed 6 Nov. 2014]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/000351.htm.

and limited her ability to concentrate. *Id.* He stated pseudotumor cerebri affected Plaintiff's vision and ability to read and caused frequent headaches. *Id.* Dr. Niemer indicated Plaintiff was restricted as follows: unable to lift over 15 pounds; unable to stand or walk more than 10 minutes at a time; unable to sit longer than 20 minutes at a time; unable to bend, stoop, crawl, or use arms for overhead work; unable to push or pull greater than 20 pounds; unable to operate heavy machinery, and unable to perform fine manipulation with her hands. *Id.*

On July 21, 2008, Bruce Frankel, M.D., surgically placed a lumboperitoneal shunt for treatment of Plaintiff's pseudotumor cerebri. Tr. at 254–55.

Plaintiff followed up with Dr. Frankel on November 24, 2009, complaining of a divot in the left midline of her forehead. Tr. at 268. Dr. Frankel referred her for a CT scan and stated that a shunt revision would be necessary if there was evidence of papilledema. *Id.*

Plaintiff presented to Low Country Rheumatology on February 16, 2010, complaining of crampy, bloated pain in her stomach. Tr. at 492. She stated that she discontinued Lyrica due to weight gain. *Id.* She was noted to have 15 fibromyalgia tender points. *Id.* Plaintiff's Lyrica prescription was replaced with a prescription for Savella and she was instructed to follow up with a neurologist regarding pseudotumor. *Id.*

A CT of Plaintiff's brain on April 16, 2010, was normal. Tr. at 289.

On May 11, 2010, Plaintiff presented to Sarah Kaufman, N.P., at MUSC's neurosurgery clinic to follow up on headaches and to obtain her CT scan results. Tr. at 312. She complained of continued headaches and pressure, mainly behind her left eye. *Id.*

4

She stated that Ultram was only somewhat helpful. *Id.* Ms. Kaufman consulted with Dr. Frankel and recommended Plaintiff undergo placement of a ventriculoperitoneal ("VP") shunt. Tr. at 313. Ms. Kaufman noted that "[d]ue to the nature of these symptoms and her frequency and severity of headaches patient has been unable to work." *Id.* She further stated, "[i]t will be recommended as well she refrain from working in her post operative recovery at least through her follow up appointment post surgery which will be roughly two weeks following her surgical date." *Id.*

A letter in the file dated July 22, 2011, indicates that Plaintiff presented to Charleston Pain Relief Center for an initial visit on July 9, 2010, complaining of bilateral neck pain, headaches, lower back pain, and left piriformis syndrome. Tr. at 295. Plaintiff rated her cervical pain as a 10 on a scale of 0 to 10. *Id.* Plaintiff complained that her neck pain radiated bilaterally into her upper extremities and caused numbness, tingling, paresthesias, and muscle weakness in her hands. *Id.* Plaintiff indicated that her neck pain was exacerbated by heat, but that she could sit without limitation. *Id.* Plaintiff also complained of lower back pain, which she described as a 10 out of 10. *Id.* She stated that it was exacerbated by standing, washing dishes, and walking. *Id.* The results of objective testing were mixed, with positive foraminal compression bilaterally, positive Soto Hall test for mid-thoracic constricture, positive straight-leg raise, positive Milgram's test, positive iliac compression, and positive Yeoman's bilaterally, but negative cervical distraction, shoulder depression, Bechterew's, Patrick's test, Adson's test, Hallstead's test, and Roos test. Tr. at 296. Multiple tests were also positive for malingering. *Id.* Mild muscle spasms were observed. *Id.* Plaintiff was noted to be five feet, nine inches tall and

to weigh 342 pounds. *Id.* Plaintiff had no restriction to mild restriction of ranges of motion in her cervical spine. Tr. at 296–97. She had no restriction to moderate restriction to ranges of motion in her lumbar spine. Tr. at 297. An x-ray of her cervical spine indicated hyperlordosis with mild anterior gravitation of the head, mild osteophytosis on the anterior inferior vertebral bodies at C5-6, and transverse process hypertrophy at C7. *Id.* Plaintiff's thoracic spine was mildly hypokyphotic, but thoracic disc spaces, bone densities, and soft tissues were unremarkable. *Id.* An x-ray of her lumbar spine showed moderate pelvic unleveling, but lumbar discs and lumbar curvature were well-maintained. *Id.* Chiropractor Matthew Jenkins, D.C., opined that no physical disability was noted and that Plaintiff had no limitations on daily activities or work-related activities. Tr. at 298. He further indicated "[t]hough many malingering tests are positive, it is my professional opinion that there are some underlying causes of her symptomatology that can be corrected with conservative chiropractic care." *Id.*

On July 12, 2010, Plaintiff visited Charleston Pain Relief Center and reported pain as a 10 out of 10 and a recent onset of bilateral knee pain. Tr. at 294. She was observed to have muscle spasms in her cervical, thoracic, and lumbar spine, mild tenderness, and hypomobility. *Id.*

Plaintiff followed up at Charleston Pain Relief Center on July 23, 2010. *Id.* She again reported 10 out of 10 pain. *Id.* She stated that she had applied for disability and would attend appointments on an as-needed basis until she was approved. *Id.* Mild spasms and hypomobility were indicated. *Id.*

On August 16, 2010, Dr. Frankel placed a VP shunt to drain Plaintiff's excess cerebrospinal fluid into her abdomen. Tr. at 323–24.

Plaintiff followed up with Dr. Frankel On August 24, 2010. Tr. at 334. She reported occasional headaches, but noted that they were less intense than before the VP shunt placement. *Id.* She complained that Oxycodone was not particularly effective at managing her headaches and she requested other medication. *Id.* She was prescribed Neurontin 300 mg, twice daily and Fioricet, as needed for headaches. *Id.* Dr. Frankel authorized for Plaintiff to receive a permanent disabled license plate, noting that she was "unable to ambulate long distances (100 feet)." Tr. at 336.

Plaintiff presented to Pamela Chavis, M.D., at Storm Eye Institute, on October 12, 2010, regarding papilledema. Tr. at 338. She complained of frontal-cervical band headaches, but noted that they were not as frequent as they were prior to the placement of the VP shunt. *Id.* However, she stated that they were frequent the previous week and were accompanied by local tenderness. *Id.* She also complained of visual floaters. *Id.* Plaintiff's vision was stable. Tr. at 340. Dr. Chavis noted headache muscle contractions and referred Plaintiff to a dentist for evaluation for possible temporomandibular joint disorders ("TMJ"). *Id.*

Plaintiff also followed up at MUSC's Neurosurgery Clinic on October 12, 2010, where she was examined by Sarah L. Denham, ANP-BC. Tr. at 342–43. Plaintiff complained of continued headaches that were less frequent than before the VP shunt placement, but just as intense. Tr. at 342. Her weight was noted to be 371.2 pounds. *Id.*

Plaintiff's blood pressure was elevated at 183/96, and she was referred to her primary care physician to discuss blood pressure control. *Id.*

Plaintiff presented to Jennifer Fiorini, M.D., on November 18, 2010, for possible incisional hernia. Tr. at 366–68. She reported a three-month history of sharp pain and enlargement under her VP shunt incision site. Tr. at 366. Plaintiff complained of chest pain, abdominal pain, abdominal bloating, nausea, vomiting, diarrhea, constipation, vision problems, and anemia. Tr. at 367. Dr. Fiorini observed a palpable soft tissue mass beneath Plaintiff's incision, which was not entirely reducible. *Id.* Dr. Fiorini discussed with Plaintiff the possible complications of surgery, including infection of the VP shunt, and Plaintiff decided that she would forego surgery at that time because her symptoms were not severe enough to assume the risk of complications. *Id.*

Plaintiff followed up with Dr. Chavis on February 15, 2011, complaining of light sensitivity, pressure sensation, and occasional tearing. Tr. at 386. Plaintiff noted that her headaches were not as frequent, but occurred approximately five times per month. *Id.* She noted they were bi-frontal and radiated down the back of her neck. *Id.* Plaintiff also indicated that she had seen a dentist, who indicated that her jaw pain was caused by dental problems that needed to be corrected. *Id.* Plaintiff's vision was within normal limits. Tr. at 389. Dr. Chavis indicated that Plaintiff had muscle contracture headaches secondary to TMJ and that she was getting braces to correct the problem. *Id.*

On March 1, 2011, Plaintiff followed up with Dr. Fiorini, complaining of nausea and discomfort at her incisional hernia site. Tr. at 363. Her examination was normal, except for tenderness at the hernia site. Tr. at 365. Dr. Fiorini recommended laparoscopic

8

incisional hernia repair with mesh. *Id.* However, Plaintiff later cancelled the surgery. Tr. at 364.

Plaintiff was examined by Robert Black, O.D., at Storm Eye Institute, on April 15, 2011. Tr. at 382–85. She complained of a dull ache with eye movement, intermittent burning, light sensitivity, and blurred distance vision. Tr. at 382. Dr. Black diagnosed eye strain and prescribed new glasses. Tr. at 384.

Plaintiff followed up with Ms. Denham in the Neurosurgery Spine Clinic on May 10, 2011, regarding abdominal pain and possible incisional hernia. Tr. at 427. Plaintiff described her headaches as "very mild," and noted a sensation of "water sloshing in her head" when changing positions quickly. *Id.* She weighed 365.2 pounds. *Id.* Plaintiff and her mother complained to Ms. Denham that Plaintiff had been denied twice for disability and Ms. Denham suggested that they be persistent with filing and possibly contact a lawyer. *Id.* Ms. Denham referred Plaintiff for a CT scan to be sure that she had an incisional hernia as opposed to a fluid collection. *Id.*

On May 11, 2011, state agency medical consultant Jim Liao, M.D., completed a physical residual functional capacity assessment in which he indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; and sit (with normal breaks) for a total of about six hours in an eight-hour workday. Tr. at 43–44.

On June 13, 2011, Dr. Frankel performed surgery to revise Plaintiff's distal shunt, remove a pseudomeningocele, and replace the shunt catheter in the peritoneal space. Tr. at 452.

Plaintiff followed up with Ms. Denham on June 28, 2011, following shunt revision and removal of the pseudomeningocele. Tr. at 435–36. She stated she was feeling better and was not taking any pain medications. Tr. at 435. She weighed 269 pounds.[4] *Id.* Plaintiff complained of nausea and Ms. Denham prescribed a short-term prescription for Zofran, but encouraged Plaintiff to follow up with her primary care physician about nausea and hypertension. Tr. at 436.

An x-ray of Plaintiff's lumbar spine on August 10, 2011, indicated no acute or significant abnormality, except for congenital short pedicles of L5, which predisposed Plaintiff to stenosis, and mild, multilevel loss of vertebral body height in her lower thoracic spine. Tr. at 487.

On August 12, 2011, state agency medical consultant Mary Lang, M.D., completed a physical residual functional capacity assessment in which she indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs; never climb

---

[4] The undersigned suspects that this weight is a typo because Plaintiff weighed 365.2 pounds on May 10, 2011. Tr. at 427.

10

ladders/ropes/scaffolds; occasionally stoop, kneel, crouch, and crawl; and avoid concentrated exposure to noise and hazards (machinery, heights, etc.).

On March 21, 2012, Plaintiff followed up with Low Country Rheumatology. Tr. at 493. She weighed 363 pounds. *Id.* She was again noted to have 15 of 18 fibromyalgia tender points. *Id.* Her fibromyalgia was indicated to be aggravated by poor sleep. *Id.* Dr. Niemer discussed with Plaintiff diet and exercise and prescribed Savella. *Id.*

Plaintiff followed up with Dr. Chavis on April 24, 2012, complaining of dizziness and sharp eye pain over the last year. Tr. at 497. She indicated she was experiencing headaches "at least twice a week." *Id.* Dr. Chavis referred Plaintiff for an MRI and an MR venogram. Tr. at 499.

An MRI on May 1, 2012, indicated no changes in Plaintiff's VP shunt and no acute abnormalities. Tr. at 500. An MR venogram was normal. Tr. at 501.

Plaintiff followed up with Ms. Denham on May 8, 2012, regarding headaches. Tr. at 502. She complained of constant, generalized headaches that affected her entire head and worsened over the past few months. *Id.* She indicated her medications were not helping. *Id.* Ms. Denham noted that Plaintiff had been referred to Dr. Thomas Hughes for headache management, but that Plaintiff had not attended the appointment. *Id.* She weighed 355.4 pounds. *Id.* Her shunt setting was checked and changed. *Id.* Ms. Denham noted that Plaintiff's weight had increased by nearly 60 pounds since her last visit and that weight gain and obesity had been linked to worsening pseudotumor and headache symptoms. *Id.* Ms. Denham discussed with Plaintiff weight loss and continued monitoring of her vision. *Id.*

Plaintiff also followed up with Dr. Chavis on May 8, 2012. Tr. at 503–05. She complained of ongoing headaches, blurred vision, and floaters. Tr. at 503. Dr. Chavis noted that Plaintiff's vision was stable. Tr. at 505.

On June 19, 2012, Plaintiff presented to Roland Hamilton, Jr., regarding headaches. Tr. at 506. Plaintiff complained that medication did not control her headaches. *Id.* She stated that they lasted one to four days and occurred approximately four times per month. Tr. at 507. She also complained of depression and not feeling rested after sleeping. Tr. at 506. Dr. Hamilton noted that Plaintiff's headaches would be difficult to control. *Id.* He prescribed Zonegran 100 mg, up to four times daily for two weeks, and then 200 mg, up to four times daily. *Id.* He also referred Plaintiff for a sleep study and to a weight loss clinic. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on August 7, 2012, Plaintiff testified she lived with her mother. Tr. at 30. She stated she helped her mother with vacuuming and light cleaning. Tr. at 31.

Plaintiff testified that she weighed 350 pounds. Tr. at 32. She indicated that it was difficult for her to exercise because of fibromyalgia, but she stated she walked around her neighborhood for about 30 minutes at a time. Tr. at 32–33.

Plaintiff testified that she was treated for fibromyalgia and pseudotumor. Tr. at 32. Plaintiff stated she experienced headaches at least twice a week that required her to lie in a dark room. Tr. at 33. She indicated that her headaches typically lasted for a day, but had

12

lasted for up to three days at a time, accompanied by dizziness and nausea. Tr. at 33–34. Plaintiff stated that medication was ineffective. Tr. at 34.

Plaintiff testified she attended church every Sunday and Bible study on Tuesdays. Tr. at 31. Plaintiff testified that she communicated with her friends by texting, talking on the telephone, and through Facebook. Tr. at 31–32. She stated her friends came to visit her. Tr. at 32.

Plaintiff stated that she was unable to attend an appointment with Dr. Hughes because she had no insurance and could not afford to go. Tr. at 35. She indicated she was enrolled in a financial assistance program through MUSC that allowed her to visit their doctors. *Id.*

> b.    Vocational Expert Testimony

Vocational Expert ("VE") Arthur Schmitt reviewed the record and testified at the hearing. Tr. at 36–38. The VE categorized Plaintiff's PRW as a graphic designer, *Dictionary of Occupational Titles* ("*DOT*") number 141.061-018, as sedentary and skilled with a specific vocational preparation ("SVP") of seven and janitorial worker, *DOT* number 382.664-010, as medium and unskilled with a SVP of two. Tr. at 36. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform a full range of light work, but would be limited to only occasional postural activities, could do no climbing, should avoid concentrated exposure to work hazards, and would be limited to simple, routine, repetitive tasks. *Id.* The VE testified that the hypothetical individual could perform light jobs with SVPs of two, as a storage facility clerk, *DOT* number 295.367-026, with 4,400 positions in South Carolina and 416,000 positions in the

United States; a ticket taker, *DOT* number 344.667-010, with 1,260 positions in South Carolina and 104,000 nationally; and a coupon redemption clerk, *DOT* number 290.477-010, with 270 positions in South Carolina and 15,900 positions nationally. Tr. at 37. The ALJ then asked what effect it would have on the jobs identified if the same hypothetical individual had difficulty with concentration for one or two hours out of the workday. *Id.* The VE testified that the individual would be unable to perform the jobs identified or any other jobs in the economy. *Id.*

Plaintiff's attorney asked the VE to indicate the general employer tolerance for missing work in the jobs identified in response to the first hypothetical. *Id.* The VE stated that no more than three days per month could be missed in the jobs identified or any other jobs in the national economy. Tr. at 37–38.

2.    The ALJ's Findings

In his decision dated August 17, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since April, 12, 2011, the application date (20 CFR 416.971 *et seq.*).
2.    The claimant has the following severe impairments: pseudotumor cerebri status-post shunt placement, fibromyalgia, headaches and obesity. (20 CFR 416.920(c)).
3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). Specifically, the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day except that the claimant can only occasionally stoop, crouch, crawl, kneel, and balance, and can never climb. The claimant must

avoid concentrated exposure to workplace hazards and is limited to simple, repetitive, routine tasks.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on June 17, 1980 and was 30 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 12, 2011, the date the application was filed (20 CFR 416.920(g)).

Tr. at 16–20.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not consider Plaintiff's impairments in combination;

2) the ALJ failed to perform a proper Listings analysis; and

3) the ALJ improperly assessed Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

16

impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Combination of Impairments

Plaintiff argues that the ALJ did not consider her impairments in combination. [ECF No. 17 at 10].

The Commissioner argues that the ALJ expressed that he considered Plaintiff's impairments in combination and did not engage in a fragmentized analysis of Plaintiff's impairments. [ECF No. 19 at 12].

When a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a

corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

However, the Fourth Circuit later indicated that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716791 (D.S.C. Aug. 28, 2012) citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995).

The ALJ indicated the following with respect to Plaintiff's residual functional capacity: "While the claimant has a history of diagnosis of, and treatment for, pseudotumor cerebri, fibromyalgia, headaches, and obesity, she retains the capacity to perform a limited range of light work, as set forth above. Tr. at 18. He later stated "I have given the claimant's subjective complaints regarding her headaches the benefit of the doubt in limiting her exposure to hazards and limiting her to simple, repetitive routine tasks." Tr. at 19. He further stated "I note that, due to the claimant's obesity and fibromyalgia, she can perform light work but with the postural limitations set forth above." *Id.*

The undersigned recommends a finding that the ALJ properly considered the combined effects of Plaintiff's impairments. Although the ALJ did not explicitly state that he considered the combined effects of all of Plaintiff's impairments, a review of his decision reveals that he did. He recognized each of Plaintiff's impairments and concluded that they would still allow her to perform a limited range of light work. *See* Tr. at 18. He limited Plaintiff to simple, repetitive, routine tasks based on her headaches. *See* Tr. at 19.

Then, he explicitly considered obesity and fibromyalgia in combination when determining that Plaintiff was limited to light work with specific postural limitations. *Id.*

Plaintiff further argues that "[a]cknowledgment of her combination of impairments ought to have impacted the ALJ's RFC analysis at least insofar as it incorporated or rejected her subjective complaints," which included "her ability to perform work on a regular and continuing basis," and that the ALJ failed to consider that her headaches and fibromyalgia contributed to her obesity, which exacerbated those conditions and her back pain. *See id.* at 1–2. While couching these as arguments about the combined effects of her impairments, Plaintiff is essentially making a credibility argument. The ALJ's failure to incorporate symptoms that he rejected into the RFC does not equate to a failure to consider Plaintiff's impairments in combination.

### 2.    Listings Analysis

Plaintiff argues that the ALJ neglected to evaluate her impairments under Listings 11.02 and 11.03, where the evidence suggested that her impairments were medically-equivalent to the listed impairments. [ECF No. 17 at 11–12]. Plaintiff maintains that, while she does not experience seizures, she does experience headaches with the frequency identified in Listings 11.02 and 11.03, and that the ALJ should have considered the frequency of her headaches in determining medical equivalence. *Id.* at 12–13.

The Commissioner argues that the ALJ expressly found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [ECF No. 19 at 4]. The Commissioner further argues

that substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or medically equal a Listing. *Id.*

At step three of the sequential evaluation, the Commissioner must determine whether the claimant has an impairment that meets or equals the requirements of one of the impairments listed in the regulations and is therefore presumptively disabled. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. § 416.925(d). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. 20 C.F.R. § 416.908. The Commissioner can also determine that the claimant's impairments are medically equivalent to a Listing, which occurs when an impairment is at least equal in severity and duration to the criteria of a Listing. 20 C.F.R. § 416.926(a). There are three ways to establish medical equivalence: (1) if the claimant has an impairment found in the Listings, but does not exhibit one or more of the findings specified in the particular Listing or one of the findings is not as severe as specified in the particular Listing, then equivalence will be found if the claimant has other findings related to the listed impairment that are at least of equal medical significance to the required criteria; (2) if the claimant has an impairment not described in the Listings, but the findings related to the impairment are at least of equal medical significance to those of a particular Listing; or (3) if the claimant has a combination of impairments and no

singular impairment meets a particular Listing, but the findings related to the impairments are at least of equal medical significance to those of a Listing. 20 C.F.R. § 416.926(b).

After identifying the proper Listing criteria, the ALJ should "compare[ ] each of the listed criteria to the evidence of [Plaintiff's] symptoms." *Cook*, 783 F.2d at 1173. *Cook v. Heckler*, however, "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." *Russell v. Chater*, 60 F.3d 824, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (Table). Rather, courts in the Fourth Circuit have found that a "point-by-point" analysis is required when, "there is 'ample factual support in the record' for a particular listing." *Beckman v. Apfel*, C/A No. 99-3696, 2000 WL 1916316, at *9 (D. Md. Dec.15, 2000).

Listings 11.02 and 11.03 are both Listings for epilepsy. Listing 11.02 requires the following:

> convulsive epilepsy (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least three months of prescribed treatment with:
>
> (A) daytime episodes (loss of consciousness and convulsive seizures); or
>
> (B) nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §11.02.

Listing 11.03 requires the following:

> nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least

> three months of prescribed treatment, with alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §11.02.

The ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." Tr. at 17.

The ALJ indicated "[t]he claimant's cerebri does not meet the qualifications to meet Listing 11.00 for neurological impairments." *Id.* He further stated that Plaintiff did not have a brain tumor or epileptic activity. *Id.*

The undersigned recommends a finding that the ALJ properly determined that Plaintiff's impairments did not meet or medically equal a Listing. As Plaintiff acknowledges, her impairments do not meet the requirements of Listing 11.02, 11.03, or any of the other Listings. [ECF No. 17 at 12]. Pursuant to 20 C.F.R. § 416.926(b), there are three ways in which a claimant's impairments may be found to equal a Listing. The first does not apply in this case because Plaintiff does not have seizures, a brain tumor, or any other impairment described in the Listings, as the ALJ correctly notes. *See* Tr. at 17. The other two ways to demonstrate medical equivalence to a Listing require an impairment or a combination of impairments with findings that "are at least of equal medical significance to those of a listed impairment." Plaintiff argues that the ALJ erred in failing to analyze whether her headaches or, alternatively, her headaches combined with symptoms of fibromyalgia, were at least of equal medical significance to the criteria

set forth in Listings 11.02, 11.03, or any other Listing. *See* ECF No. 17 at 12–13. The undersigned does not find this argument persuasive. Merely because Plaintiff alleged that she experienced headaches as frequently as is required for seizure activity under Listings 11.02 and 11.03 does not mean that the ALJ erred in failing to analyze whether her impairment or combination of impairments were medically equivalent to these or any other Listings. Requiring an ALJ to perform a Listings analysis any time a claimant alleges symptoms that occur with the frequency of different symptoms included under a Listing would create an undue burden on the ALJ. *Cook v. Heckler* requires a point-by-point analysis after proper Listings criteria are identified. *See* 783 F.2d at 1173. However, where, as here, proper Listings criteria cannot be identified, it is not necessary for an ALJ to conduct a point-by-point analysis for medical equivalence.

> 3.    RFC Assessment

The undersigned recommends a finding that the ALJ failed to properly assess Plaintiff's RFC for the reasons set forth below.

> a.    Subjective Complaints

Plaintiff maintains that the ALJ's RFC determination was based on a flawed assessment of her credibility and complaints of pain. [ECF No. 17 at 16–17].

The Commissioner argues that the ALJ properly considered Plaintiff's subjective complaints and supported his credibility finding with substantial evidence. [ECF No. 19 at 7–8].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical

evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. § 416.929; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76 F.3d at 594 (internal quotation omitted). Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595. This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to

perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Pursuant to 20 C.F.R. § 416.930, a claimant cannot be found disabled if she does not follow prescribed treatment without good reasons. SSR 96-7p provides that "an individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." However, the ALJ must consider the claimant's explanations for a failure to follow prescribed treatment before drawing negative inferences about his or her symptoms and their functional effects. SSR 96-7p. The ALJ is specifically required to consider physical, mental, educational, and linguistic limitations when determining if a claimant has good reasons for failing to follow prescribed treatment. 20 C.F.R. § 416.930(c). The Fourth Circuit also prohibits ALJs from denying a claimant benefits based on a failure to follow prescribed treatment where the claimant lacks the financial resources to obtain treatment. *See Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir.

27

1986) (holding that the ALJ erred in determining that the plaintiff's impairment was not severe based on her failure to seek treatment where the record reflected that she could not afford treatment); *Gordon v. Schweiker*, 725 F. 2d 231, 237 (4th Cir. 1984) ("it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him."). In *Fleming v. Astrue*, C/A No. 5:11-304-DCN-KDW, 2012 WL 3686622 (D.S.C. Jul. 10, 2012), *adopted by* 2012 WL 3679628 (D.S.C. Aug. 24, 2012), this court found that the ALJ's credibility assessment was flawed and remanded the case where the ALJ considered the plaintiff's failure to seek treatment as a factor in the disability determination and the record reflected that the plaintiff did not have the financial resources to obtain treatment.

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, but that her statements were not fully credible because she failed to follow through with suggested headache management with a neurologist and with a CT scan for a suspected hernia and because the medical evidence suggested that her condition would improve significantly if she lost weight. *Id.* He discussed Plaintiff's treatment notes and a MRI report. Tr. at 18–19. The ALJ noted that Plaintiff "described her headaches as 'very mild' following stent placement." Tr. at 18. However, he acknowledged that recent treatment notes indicated Plaintiff complained of increased headaches. *Id.* The ALJ noted a perceived inconsistency in that "[w]hile the claimant testified that she has headaches at least twice per week, she reported in June 2012 that they occur approximately four times per month." Tr. at 19.

The undersigned is constrained to find that the ALJ did not properly evaluate Plaintiff's credibility. The ALJ drew negative inferences about Plaintiff's symptoms and their functional effects based on her failure to follow prescribed treatment, but he failed to consider her reasons for noncompliance. He pointed to three instances of noncompliance: Plaintiff's failure to follow up with the headache specialist, her failure to obtain a CT scan for a possible hernia, and her failure to lose weight. Plaintiff provided explanations for two of these, stating that she could not see Dr. Hughes because she had no insurance and could not afford to pay for the visit and that she had difficulty exercising because of symptoms of fibromyalgia. *See* Tr. at 32–33, 35. While the ALJ noted the explanations in his discussion of Plaintiff's testimony, he neglected to consider them in assessing her credibility. *See* Tr. at 18. Pursuant to 20 C.F.R. § 416.930(c), the ALJ must consider physical limitations when determining if a claimant has acceptable reasons for failing to follow prescribed treatment. The Fourth Circuit has also indicated that inability to afford treatment should be considered as an acceptable reason for failing to obtain medical treatment. Because the ALJ failed to consider either of these explanations, which are regarded as acceptable reasons for failing to follow prescribed treatment, his credibility determination was flawed.

The ALJ also erred in determining that Plaintiff failed to obtain a CT scan for a possible hernia. The record reflects that what was initially diagnosed as a hernia was actually a pseudomeninogocele and that Plaintiff did obtain treatment. Plaintiff initially presented to Dr. Fiorini, who diagnosed an incisional hernia. Tr. at 363–65, 366–68. She later followed up with Ms. Denham in the Neurosurgery Spine Clinic, who referred her

for a CT scan in order to be sure that she had an incisional hernia as opposed to a fluid collection. *See* Tr. at 427. While the results of the CT scan are not included in the record, the record does contain an operative report from Dr. Frankel dated June 13, 2011, for surgery to revise Plaintiff's distal shunt, remove a pseudomeningocele in her abdomen, and replace the shunt catheter. *See* Tr. at 452. In light of this evidence, the ALJ's conclusion that Plaintiff was noncompliant in failing to follow up regarding a hernia is in error. Although the ALJ provided other reasons for finding that Plaintiff's statements were not fully credible, those reasons are undermined by his failure to consider Plaintiff's reasons for noncompliance and his allegation of noncompliance where Plaintiff complied with treatment recommendations. Therefore, the ALJ's credibility determination is unsupported by substantial evidence.

b.    Regular and Continuing Basis

Plaintiff argues that because the ALJ failed to address the frequency of her headaches or to assess how they limited her ability to function, he did not consider her ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. [ECF No. 17 at 14].

The Commissioner argues that a separate determination as to a claimant's ability to perform the described work activity on a regular and continuing basis is unnecessary because the RFC is a finding of the claimant's maximum ability to perform sustained work activities on a regular and continuing basis. [ECF No. 19 at 6].

A claimant's RFC is the most that the individual can still do despite his or her limitations. 20 C.F.R. § 416.945. Pursuant to SSR 96-8p, the RFC assessment must

"include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule, describe the maximum amount of each work-related activity the individual can perform based upon the evidence in the case record, and resolve any material inconsistencies or ambiguities in the evidence. *Id.*

The ALJ addressed Plaintiff's headaches in assessing her RFC. He recited Plaintiff's testimony indicating that she experienced "twice-weekly migraine-like headaches" that "require her to lie down in a dark room" and that "prevent her from working." Tr. at 18. However, he concluded that Plaintiff's statements were not fully credible. *Id.* He stated "I have given the claimant's subjective complaints regarding her headaches the benefit of the doubt in limiting her exposure to hazards and limiting her to simple, repetitive, routine tasks." Tr. at 19.

Central to Plaintiff's argument is a contention that the ALJ was required to make a determination as to how frequently her headaches occurred because she was unable to work when she had headaches. *See* ECF No. 17 at 14–15. However, the ALJ did not find that her headaches prevented her from working when they occurred, but instead found that they limited the type of work she could perform. *See* Tr. at 19. Because the ALJ imposed these particular restrictions on Plaintiff's ability to work at all times instead of imposing particular restrictions at times when headaches occurred, it was unnecessary for

him to determine the frequency of Plaintiff's headaches. However, because the undersigned has recommended that the ALJ reassess Plaintiff's credibility, it will be necessary for the ALJ to reevaluate the limitations imposed by Plaintiff's headaches. Should the ALJ find that certain restrictions only apply when Plaintiff has headaches, he would need to assess the frequency of her headaches and their impact on her ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.

c.    Medical Opinions

Plaintiff contends the ALJ ignored multiple medical opinions in the record. [ECF No. 17 at 18–19].

The Commissioner maintains that the only medical opinions in the record that suggested that Plaintiff was unable to work pertained to periods before her alleged onset date. *Id.* at 11–12.

The ALJ is required to assess a claimant's residual functional capacity based on all relevant evidence in the case record. 20 C.F.R. § 416.945(a)(1). Furthermore, the ALJ must consider "any statements about what you can still do that have been provided by medical sources." 20 C.F.R. § 416.945(a)(3). Pursuant to 20 C.F.R. § 416.927(c), the ALJ must consider and weigh every medical opinion that is received. Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p *quoting* 20 C.F.R. § 416.927(a)(2).

The ALJ indicated the following:

> Pursuant to 20 CFR §404.1527, §416.927, and Social Security Rulings 96-6p and 96-2p, I have considered the medical opinions of the claimant's treating physicians, evaluating physicians, and the state agency medical consultants. I note that, since her established onset date, none of the claimant's treating physicians has offered any medical opinion with regard to her functional limitations.

Tr. at 19.

The record contains three medical opinions.[7] The first opinion was rendered by Dr. Niemer on October 20, 2005, and contained very specific restrictions related to Plaintiff's diagnoses of fibromyalgia and pseudotumor cerebri. *See* Tr. at 227. The second opinion was rendered by Ms. Kaufman and signed off on by Dr. Frankel on May 11, 2010. *See* Tr. at 313. It indicated that Plaintiff had been unable to work and would remain unable to work at least through her first surgical follow up appointment. *Id.* A third medical opinion in the record, rendered by Dr. Frankel on August 24, 2010, states that Plaintiff is "unable to ambulate long distances (100 feet)." *See* Tr. at 336. Although Plaintiff argues that a fourth opinion exists in the form of Ms. Denham's indication that she should be consistent in filing for disability, this statement does not meet the definition of a medical opinion in 20 C.F.R. § 416.927(a)(2).[8]

---

[7] The record also contains an opinion from Matthew Jenkins, D.C., based on an assessment conducted on July 9, 2010. Tr. at 298. However, this is not a medical opinion because a chiropractor is not an acceptable medical source under 20 C.F.R. § 416.913(a).

[8] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Ms. Denham, a nurse practitioner was not an acceptable medical source under 20 C.F.R. § 416.913(a), and her statement did not provide information about Plaintiff's symptoms, diagnosis, prognosis, abilities, or restrictions.

The undersigned recommends a finding that the ALJ failed to properly consider the medical opinions in the record. The ALJ reasonably concluded that there were no medical opinions from any of Plaintiff's treating physicians regarding her functional limitations since her established onset date. *See* Tr. at 19. The ALJ did not err in neglecting to address the May 11, 2010, opinion rendered by Dr. Frankel and Ms. Kaufman because it provided a temporary restriction that pertained to a period months before Plaintiff's established onset date. However, the two remaining opinions from Dr. Niemer and Dr. Frankel set forth specific restrictions imposed by the impairments the ALJ deemed to be severe. Plaintiff continued to treat with both of these physicians through 2012. *See* Tr. at 493, 502 (Dr. Frankel noted as attending physician). While the ALJ may have concluded that they did not apply because they were rendered before the relevant period, he was still required to consider and weigh them as part of the case record.

Dr. Niemer's and Dr. Frankel's opinions set forth restrictions that were greater than those identified by the ALJ in the RFC. Dr. Niemer indicated that Plaintiff was unable to lift greater than 15 pounds, but the ALJ found that Plaintiff could lift 20 pounds. *See* Tr. at 17, 227. Dr. Neimer stated that Plaintiff could not stand and walk for greater than 10 minutes at a time or sit for longer than 20 minutes at a time and Dr. Frankel stated that she could not ambulate 100 feet, but the ALJ found that she could stand, walk, and sit for six hours in an eight-hour day. *See Id.*, Tr. at 336. Dr. Niemer indicated that Plaintiff could not stoop or crawl, but the ALJ found that she could stoop and crawl on an occasional basis. *See* Tr. at 17, 227. Dr. Niemer stated that Plaintiff

could not bend, use her arms for overhead work, or use her hands for fine manipulation, but the ALJ imposed no limitations with respect to these functions. The RFC assessment is flawed because the ALJ neglected to consider all relevant evidence in the case record and to resolve the conflicts between the medical opinions of Dr. Niemer and Dr. Frankel and his RFC assessment.

## III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

November 6, 2014                          Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).